IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SEI INVESTMENTS GLOBAL FUNDS SERVICES, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| CITIBANK, N.A., | : | |
| | : | NO. _____ |
| Defendant. | : | |

## COMPLAINT

Plaintiff SEI Investments Global Funds Services hereby aver and allege against defendants Citibank, NA ("Citibank"):

## The Parties

1.      Plaintiff SEI Investments Global Funds Services ("SEI") is a Delaware statutory trust with its principle place of business in Oaks, Pennsylvania.  SEI is a wholly-owned subsidiary of SIMC Subsidiary, LLC, a Delaware limited liability company, and the trustee is SEI Funds, Inc., a Delaware corporation, both of which have their principal places of business in Oaks, Pennsylvania.

2.      Citibank NA is a national banking association with its main office located in South Dakota.

## Jurisdiction and Venue

3.      This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332 because there exists diversity of citizenship between the parties amount in controversy exceeds $100,000, exclusive of interest and costs.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events giving rise to SEI's claims herein occurred in this district.

1

## Background

5.      In or about October 2013, The Advisors' Inner Circle Fund II ("TAICF-II") entered into an Investment Advisory Agreement with Kopernik Global Investors, LLC ("Kopernik") pursuant to which Kopernik provided investment advisory services with respect to, inter alia, the Kopernik Global All-Cap Fund (the "Fund").

6.      TAICF-II entered into an Amended and Restated Global Custodial Services Agreement (the "Agreement") with Citibank that governed, among others, a custodial account (the "Account") maintained at Citibank for the Fund.  A true and correct copy of the Agreement is attached as Exhibit A.

7.      By Amendment in October 2014, the listing of funds for which Citibank would serve as custodian was amended to include the Fund.

8.      The Agreement governed, among other things, the communication of instructions between the TAICF-II and/or any "Authorized Person," on the one hand, and the "Citigroup Organisation," as defined in the Agreement, on the other, regarding the Account.  The Agreement provides that such instructions may be "by any means, provided that the Custodian and the Client have agreed upon the means of transmission and the method of identification for the instructions."  See Exh. A at § 5.

9.      In connection with the Account and the Agreement, in October 2013 Citibank also provided to SEI and Kopernik a copy of its Global Custody Service Standards (the "Citibank Standards"), which provided, among other things, that "[c]lients will be advised (usually within two business hours of receipt) if any instruction received prior to the published securities cut-off times, cannot be processed on the day of receipt, due to the format received or incomplete or unauthenticated instructions. . . ."

10.    AICF-II notified Citibank that SEI Global Services, Inc. ("SEI-GSI"), an affiliate of SEI which had contracted with Kopernik to provide services with respect to the Fund, was an "Authorized Person" for purposes of giving instructions to the Citigroup Organisation regarding the Account.

11.    One of the methods by which the parties agreed that instructions could be communicated to the Citigroup Organisation was via SEI-SI's trade communication system, Lightspeed TDMS, which generate instructions called SWIFT messages.

12.    On November 5, 2013, SEI-GSI created instructions (the "Trade Instructions") to Citibank via SWIFT to settle four securities trades involving the Fund.

13.    Consistent with SEI-GSI's standard practice in transmitting such instructions to Citibank via SWIFT with respect to the Account, the Trade Instructions recited for each trade a unique, identifying number.

14.    The Trade Instructions were not sent to Citibank on November 5, 2013.

15.    On November 6, 2013, SEI-GSI sent cancellation instructions for the four trades included in the Trade Instructions (the "Cancellation Instructions") to Citibank via SWIFT.

16.    The Cancellation Instructions contained the unique identifying numbers for the four trades (included in the Trade Instructions) SEI sought to cancel.

17.    Citibank received the Cancellation Instructions on November 6, 2013.

18.    Upon receipt of the Cancellation Instructions, Citibank neither informed SEI-GSI that it had not received trade instructions that corresponded to the identifying numbers in the Cancellation Instructions nor advised SEI-GSI that it was unable to act on the Cancellation Instructions.

19.    Rather, on information and belief, Citibank merely placed the Cancellation Instructions into a "hold queue" and took no other action.

20.    The Trade Instructions were not sent to Citibank until November 8, 2013, and Citibank received them that day.

21.    Despite having had the Cancellation Instructions in Citibank's "hold queue" for two days, upon receipt of the Trade Instructions on November 8, 2013, Citibank nonetheless executed the four trades.

22.    In so doing, Citibank either failed to match the trade identification numbers of the Trade Instructions with the Cancellation Instructions or, having done so, nonetheless failed to comply with the Cancellation Instructions.

23.    SEI-GSI noticed that the four cancelled trades had nonetheless been executed by Citibank, SEI-GSI again sent instructions cancelling the four trades to Citibank on November 8, 2013.

24.    Citibank did not execute the Cancellation Instructions until November 11, 2013.

25.    Because of the delay caused by Citibank's failure either timely to advise SEI-GSI that it had received instructions it could not implement or to cancel the four trades in accordance with the Cancellation Instructions, the Fund suffered foreign exchange losses in the amount of $630,489.13 because foreign exchange rates had moved unfavorably in the interim.

26.    Kopernik made a demand for reimbursement of the Fund for all losses resulting from the four trades.

27.    Without admitting of liability or responsibility, and to prevent further loss or damage to the Fund as a result of the foreign exchange losses, SEI on February 12, 2014

4

reimbursed the Fund $100,038.67 and on April 30, 2014, SEI reimbursed the Fund a further $430,450.46 in respect of losses resulting from the trade errors caused by Citibank's actions.

28.    On May 27, 2014, the Fund executed an Assignment of Claims to SEI of the Fund's rights claims and causes of action with respect the trade errors and the resulting losses, including all rights against Citibank.  The Assignment of Claims agreement is attached as Exhibit B.

29.    Citibank has refused demands that it reimburse SEI for the amounts SEI paid to the Fund to make it whole for the losses caused by Citibank.

**Count I - Breach of Contract**

30.    SEI hereby incorporates by reference the averments of paragraphs 1 through 29 as though fully set forth at length herein.

31.    The Agreement was a valid contract, binding on Citibank at all times material hereto.

32.    Citibank's undertakings in the Citibank Standards also constituted contractual obligations of Citibank.

33.    By failing to effectuate the Cancellation Instructions upon receipt – or to notify SEI that it had received instructions it could not execute – Citibank breached its contractual obligations under the Agreement, the Citibank Standards and otherwise.

34.    As a result of Citibank's breach, the Fund suffered losses in excess of $600,000.

35.    As assignee under the Assignment of Claims, SEI is entitled to recover from Citibank in the amount SEI paid the Fund, *i.e.* $530,489.13, plus interest.

WHEREFORE, SEI demands judgment against Citibank in the amount of $530,489.13, plus interest, costs of suit and such further relief as the Court may deem appropriate.

## Count II - Negligence

36.    SEI hereby incorporates by reference the averments of paragraphs 1 through 35 as though fully set forth at length herein.

37.    Citibank was under a duty of reasonable care in executing instructions received from SEI with respect to the Account.

38.    By failing to act promptly and appropriately upon receipt of the Cancellation Instructions, Citibank breached its duty of care.

39.    By subjecting the Fund to avoidable risks of currency shifts following its improper execution of the Trade Instructions, Citibank caused damage to the Fund in an amount in excess of $600,000.

40.    The Fund has assigned to SEI all claims arising out of Citibank's negligence.

WHEREFORE, SEI demands judgment against Citibank in the amount of $530,489.13, plus interest, costs of suit and such further relief as the Court may deem appropriate.

## Count IIII – Restitution

41.    SEI hereby incorporates by reference the averments of paragraphs 1 through 39 as though fully set forth at length herein.

42.    Because of the delay caused by Citibank's negligence and/or breach of its contractual obligations, the Fund suffered losses in excess of $600,000.

43.    SEI's reimbursement of the Fund for its losses occasioned by Citibank's failure to execute the Cancellation Instructions prevented further harm or damage which the Fund was likely to incur vis-à-vis its investors, regulatory agencies and otherwise.

6

44.    Citibank's refusal to reimburse the amounts SEI expended to make the Fund whole and prevent further loss or damage to it, Citibank has been unjustly enriched at SEI's expense.

45.    SEI is entitled to recover from Citibank the amounts SEI paid the Fund in respect of losses occasioned by Citibank's inaction.

WHEREFORE, SEI demands judgment against Citibank in the amount of $530,489.13, plus interest, costs of suit and such further relief as the Court may deem appropriate.

### Count IIIV – Indemnification

46.    SEI hereby incorporates by reference the averments of paragraphs 1 through 45 as though fully set forth at length herein.

47.    SEI is without active fault for the losses incurred by the Fund.

48.    By virtue of its conduct as described above, Citibank is primarily liable for the losses incurred to the Fund caused by its inaction.

49.    SEI is entitled to indemnification from Citibank for the losses incurred to the Fund as a result of Citibank's actions.

WHEREFORE, SEI demands judgment against Citibank in the amount of $530,489.13, plus interest, costs of suit and such further relief as the Court may deem appropriate.

### Jury Trial Demand

SEI hereby demands a trial by jury.

7

Respectfully Submitted,

**WILBRAHAM, LAWLER & BUBA**

Brady L. Green
James F. Tate
Wilbraham, Lawler & Buba
1818 Market Street, Suite 3100
Philadelphia, PA  19103
215.972.2860/2827
Attorneys for Plaintiff
SEI Investments Global Funds Services

Dated:  October 20, 2014

8

# EXHIBIT A



# AMENDED AND RESTATED
# GLOBAL
# CUSTODIAL SERVICES AGREEMENT

# THE ADVISORS' INNER CIRCLE FUND II

# TABLE OF CONTENTS

1.   DEFINITIONS AND INTERPRETATION ...................................................... 1

2.   ESTABLISHMENT OF ACCOUNTS ........................................................ 1

3.   CUSTODY ACCOUNT PROCEDURES .................................................... 2

4.   CASH ACCOUNT PROCEDURES ........................................................ 2

5.   INSTRUCTIONS ........................................................................ 3

6.   PERFORMANCE BY THE CUSTODIAN ................................................... 3

7.   TAX STATUS/WITHHOLDING TAXES .................................................. 4

8.   USE OF THIRD PARTIES ............................................................... 4

9.   REPRESENTATIONS .................................................................... 5

10.  SCOPE OF RESPONSIBILITY .......................................................... 6

11   SUBROGATION ........................................................................ 7

12.  INDEMNITY ............................................................................ 7

13.  LIEN AND SET OFF .................................................................... 7

14.  FEES AND EXPENSES ................................................................. 7

15.  CITIGROUP ORGANISATION INVOLVEMENT ......................................... 8

16.  RECORDS AND ACCESS .............................................................. 8

17.  INFORMATION ........................................................................ 8

18.  ADVERTISING ........................................................................ 8

19.  TERMINATION. ....................................................................... 8

20.  GOVERNING LAW AND JURISDICTION ............................................... 9

21.  MISCELLANEOUS .................................................................... 9

     SIGNATURES ........................................................................ 10

Schedules:

* Fee Schedule

THIS AMENDED AND RESTATED GLOBAL CUSTODIAL SERVICES AGREEMENT (the "*Agreement*") is effective as of ___July 1st___, 2013, by and between The Advisors' Inner Circle Fund II, a corporation organised under the laws of the United States of America, (the "*Client*") and Citibank, N.A. acting through its offices located in New York (the "*Custodian*"), and amends and replaces in its entirety that certain Global Custodial Services Agreement dated as of May 23, 2011 between the parties hereto.

1.    DEFINITIONS AND INTERPRETATION

(A)    *Definitions.*

"*Authorised Person*" means the Client or any person (including any individual or entity) authorised by the Client to act on its behalf in the performance of any act, discretion or duty under this Agreement (including, for the avoidance of doubt, any officer or employee of such person) in a notice reasonably acceptable to the Custodian.

"*Cash*" means all cash or cash equivalents in any currency received and held on the terms of this Agreement.

"*Citigroup Organisation*" means Citigroup, Inc. and any company or other entity of which Citigroup, Inc. is directly or indirectly a shareholder or owner. For purposes of this Agreement, each branch of Citibank, N.A. shall be a separate member of the Citigroup Organisation.

"*Clearance System*" means any clearing agency, settlement system or depository (including any entity that acts as a system for the central handling of Securities in the country where it is incorporated or organised or that acts as a transnational system for the central handling of Securities) used in connection with transactions relating to Securities and any nominee of the foregoing.

"*Fee Schedule*" means the schedule referred to in Section 14, as annexed hereto.

"*Instructions*" means any and all instructions (including approvals, consents and notices) received by the Custodian from, or reasonably believed by the Custodian to be from, any Authorised Person, including any instructions communicated through any manual or electronic medium or system agreed between the Client and the Custodian.

"*Securities*" means any financial asset (other than Cash) from time to time held for the Client on the terms of this Agreement.

"*Taxes*" means all taxes, levies, imposts, charges, assessments, deductions, withholdings and related liabilities, including additions to tax, penalties and interest imposed on or in respect of (i) Securities or Cash, (ii) the transactions effected under this Agreement or (iii) the Client; provided that "Taxes" does not include income or franchise taxes imposed on or measured by the net income of the Custodian or its agents.

(B)    *Interpretation.*

References in this Agreement to schedules shall be deemed to be references to schedules, the terms of which shall be incorporated into and form part of this Agreement. References in this Agreement to the Client shall mean the Client acting individually and separately on behalf of each of its investment portfolios (each a "Fund"). The appointment of the Custodian subject to the terms and provisions of this Agreement shall constitute a separate appointment by the Client on behalf of each Fund. Except as otherwise agreed, each reference herein to Accounts and to Securities and Cash shall mean the Accounts, Securities and Cash maintained, received, delivered and held separately for a Fund and not on an omnibus basis or aggregate basis for all of the Funds.

2.    ESTABLISHMENT OF ACCOUNTS

(A)    *Accounts.* The Client authorises the Custodian to establish on its books, pursuant to the terms of this Agreement, (i) a custody account or accounts (the "Custody Account") and (ii) a cash account or accounts (the "Cash Account"). The Custody Account will be a custody account for the receipt, safekeeping and maintenance of Securities, and the Cash Account will be a current account for Cash.

(B)    *Acceptance of Securities and Cash.* The Custodian will determine in its reasonable discretion whether to accept (i) for custody in the Custody Account, Securities of any kind and (ii) for deposit in the Cash Account, Cash in any currency.

(C)    *Designation of Accounts.*

(i)    The Custody Account will be in the name of the Fund or such other name as the Client may reasonably designate and will indicate that Securities do not belong to the Custodian and are segregated from the Custodian's assets.

(ii)   The Cash Account will be in the name of the Fund or such other name as the Client may reasonably designate and will be held by the Custodian as banker.

(D)    *Segregation.*

(i)    To the extent reasonably practicable, the Custodian will hold Securities with a subcustodian only in an account which holds exclusively assets held by the Custodian for its customers. The Custodian will direct each subcustodian to identify on its books that Securities are held for the account of the Custodian as custodian for its customers. The Custodian will direct each subcustodian, to the extent practicable, to hold Securities in a Clearance System only in an account of the subcustodian which holds exclusively assets held by the subcustodian for its customers.

(ii)   Any Securities deposited by the Custodian with a subcustodian will be subject only to the instructions of the Custodian, and any Securities held in a Clearance System for the account of a subcustodian will be subject only to the instructions of the subcustodian.

(iii)  The Custodian shall require the subcustodian to agree that Securities will not be subject to any right, charge, security interest, lien or claim of any kind in favour of the subcustodian.

3.    CUSTODY ACCOUNT PROCEDURES

(A)    *Credits to the Custody Account.* The Custodian is not obligated to credit Securities to the Custody Account before receipt of such Securities by final settlement.

(B)    *Debits to the Custody Account.* If the Custodian has received Instructions that would result in the delivery of Securities exceeding credits to the Custody Account for that Security, the Custodian may reject the Instructions or may decide which deliveries it will make (in whole or in part and in the order it selects).

(C)    *Denomination of Securities.* The Client shall bear the risk and expense associated with investing in Securities denominated in any currency.

4.    CASH ACCOUNT PROCEDURES

(A)    *Credits and Debits to the Cash Account.* The Custodian is not obliged to make a credit or debit to the Cash Account before receipt by the Custodian of a corresponding and final payment in cleared funds. If the Custodian makes a credit or debit before such receipt, the Custodian may at any time reverse all or part of the credit or debit (including any interest thereon), make an appropriate entry to the Cash Account, and if it reasonably so decides, require repayment of any amount corresponding to any debit.

(B)    *Debit Balances in the Cash Account.* The Custodian is not obliged to make any debit to the Cash Account which might result in or increase a debit balance. The Custodian may make any debit to the Cash Account even if this results in (or increases) a debit balance. If the total amount of debits to the



Cash Account at any time would otherwise result in a debit balance or exceed the immediately available funds credited to the Cash Account, the Custodian may decide which debits it will make (in whole or in part and in the order it selects).

(C) **Payments.** The Custodian may at any time cancel any extension of credit. The Client will transfer to the Custodian on closure of the Cash Account and otherwise on demand from the Custodian sufficient immediately available funds to cover any debit balance on the Cash Account or any other extension of credit and any interest, fees and other amounts owed.

(D) **Foreign Currency Risks.** The Client shall bear the risk and expense associated with Cash denominated in any currency.

## 5.    INSTRUCTIONS

The Custodian is entitled to rely and act upon Instructions of any Authorised Person until the Custodian has received notice of any change from the Client and has had a reasonable time to note and implement such change. The Custodian is authorised to rely upon any Instructions received by any means, provided that the Custodian and the Client have agreed upon the means of transmission and the method of identification for the Instructions. In particular:

(i)     The Client and the Custodian will comply with security procedures designed to verify the origination of Instructions.

(ii)    The Custodian is not responsible for errors or omissions made by the Client or resulting from fraud or the duplication of any Instruction by the Client, and the Custodian may act on any Instruction by reference to an account number only, even if any account name is provided.

(iii)   The Custodian may act on an Instruction if it reasonably believes it contains sufficient information.

(iv)    The Custodian may decide not to act on an Instruction where it reasonably doubts its contents, authorisation, origination or compliance with any security procedures and will promptly notify the Client of its decision.

(v)     If the Custodian acts on any Instruction sent manually (including facsimile or telephone), then, if the Custodian complies with the security procedures, the Client will be responsible for any loss the Custodian may incur in connection with that Instruction. The Client expressly acknowledges that the Client is aware that the use of manual forms of communication to convey Instructions increases the risk of error, security and privacy issues and fraudulent activities.

(vi)    Instructions are to be given in the English language.

(vii)   The Custodian is obligated to act on Instructions only within applicable cut-off times on banking days when the Custodian and the applicable financial markets are open for business.

(viii)  In some securities markets, securities deliveries and payments therefor may not be or are not customarily made simultaneously. Accordingly, notwithstanding the Client's Instruction to deliver Securities against payment or to pay for Securities against delivery, the Custodian may make or accept payment for or delivery of Securities at such time and in such form and manner as is in accordance with relevant local law and practice or with the customs prevailing in the relevant market.

## 6.    PERFORMANCE BY THE CUSTODIAN

(A) **Custodial Duties Requiring Instructions.** The Custodian shall carry out the following actions only upon receipt of and in accordance with specific Instructions:

(i)     make payment for and/or receive any Securities or deliver or dispose of any Securities except as otherwise specifically provided for in this Agreement;

(ii)    deal with rights, conversions, options, warrants and other similar interests or any other discretionary right in connection with Securities; and

(iii)    carry out any action affecting Securities or the Custody Account or Cash or the Cash Account other than those specified in Section 6(B) below, but in each instance subject to the agreement of the Custodian.

(B)    **Non-Discretionary Custodial Duties.** Absent a contrary Instruction, the Custodian shall carry out the following without further Instructions:

(i)    in the Client's or Fund's name or on their behalf, sign any affidavits, certificates of ownership and other certificates and documents relating to Securities which may be required (i) to obtain any Securities or Cash or (ii) by any tax or regulatory authority;

(ii)    collect, receive, and/or credit the Custody Account or Cash Account, as appropriate, with all income, payments and distributions in respect of Securities and any capital arising out of or in connection with Securities (including all Securities received by the Custodian as a result of a stock dividend, bonus issue, share sub-division or reorganisation, capitalisation of reserves or otherwise) and take any action necessary and proper in connection therewith;

(iii)    exchange interim or temporary receipts for definitive certificates, and old or overstamped certificates for new certificates;

(iv)    notify the Client of notices, circulars, reports and announcements which the Custodian has received, in the course of acting in the capacity of custodian, concerning Securities held on the Client's behalf that require discretionary action;

(v)    make any payment by debiting the Cash Account or any other designated account of the Client with the Custodian as required to effect any Instruction; and

(vi)    attend to all non-discretionary matters in connection with anything provided in this Section 6(B) or any Instruction.


7.    TAX STATUS/WITHHOLDING TAXES

(A)    **Information.** The Client will provide the Custodian, from time to time and in a timely manner, with information and proof (copies or originals) as the Custodian reasonably requests, as to the Client's Fund's tax status or residence. Information and proof may include, as appropriate, executing certificates, making representations and warranties, or providing other information or documents in respect of Securities, as the Custodian deems necessary or proper to fulfill obligations under applicable law.

(B)    **Payment.** If any Taxes become payable with respect to any payment to be made to the Client or a Fund, such Taxes will be payable by the Client or a Fund and the Custodian may withhold the Taxes from such payment. The Custodian may withhold any Cash held or received with respect to the Cash Account and apply such Cash in satisfaction of such Taxes. If any Taxes become payable with respect to any prior payment made to the Client or a Fund by the Custodian, the Custodian may withhold any Cash in satisfaction of such prior Taxes. The Client or a Fund shall remain liable for any deficiency.

(C)    **Tax Relief.** In the event the Client requests that the Custodian provide tax relief services and the Custodian agrees to provide such services, the Custodian shall apply for appropriate tax relief (either by way of reduced tax rates at the time of an income payment or retrospective tax reclaims in certain markets as agreed from time to time); provided the Client provides to the Custodian such documentation and information as to it or its underlying beneficial owner clients as is necessary to secure such tax relief. However, in no event shall the Custodian be responsible, or liable, for any Taxes resulting from the inability to secure tax relief, or for the failure of any Client or beneficial owner to obtain the benefit of credits, on the basis of foreign taxes withheld, against any income tax liability.

8.  USE OF THIRD PARTIES

(A)  *General Authority.*

(i)  The Custodian is hereby authorised to appoint subcustodians and administrative support providers as its delegates and to use or participate in market infrastructures and Clearance Systems to perform any of the duties of the Custodian under this Agreement.

(ii)  Subcustodians are those persons utilised by the Custodian for the safe-keeping, clearance and settlement of Securities.

(iii)  Administrative support providers are those persons utilised by the Custodian to perform ancillary services of a purely administrative nature such as couriers, messengers or other commercial transport systems.

(iv)  Market infrastructures are public utilities, external telecommunications facilities and other common carriers of electronic and other messages, and external postal services. Market infrastructures are not delegates of the Custodian.

(v)  Securities deposited with Clearance Systems hereunder will be subject to the laws, rules, statements of principle and practices of such Clearance Systems. Clearance Systems are not delegates of the Custodian.

(B)  *Responsibility.*

(i)  The Custodian shall act in good faith and use reasonable care in the selection and continued appointment of subcustodians and administrative support providers, but shall otherwise have no responsibility for performance by such persons of any of the duties delegated to them under this Agreement.

(ii)  The Custodian may deposit or procure the deposit of Securities with any Clearance System as required by law, regulation or best market practice. The Custodian has no responsibility for selection or appointment of, or for performance by, any Clearance System or market infrastructure.

(iii)  Notwithstanding the foregoing and pursuant to Section 10, the Custodian shall be responsible for the negligence, wilful misconduct or fraud of any branch or subsidiary of the Custodian that is a subcustodian or administrative support provider.

(C)  *Shareholders Voting.* The Custodian's only obligation in regard to any matter where the Client may exercise shareholder voting rights will be to provide shareholder voting services as specified in a separate proxy services letter between the Custodian and the Client.


9.  REPRESENTATIONS

(A)  *General.* The Client and the Custodian each represents at the date this Agreement is entered into and any custodial service is used or provided that:

(i)  It is duly organised and in good standing in every jurisdiction where it is required so to be;

(ii)  It has the power and authority to sign and to perform its obligations under this Agreement;

(iii)  This Agreement is duly authorised and signed and is its legal, valid and binding obligation;

(iv)  Any consent, authorisation or instruction required in connection with its execution and performance of this Agreement has been provided by any relevant third party;

(v)  Any act required by any relevant governmental or other authority to be done in connection with its execution and performance of this Agreement has been or will be done (and will be renewed if necessary); and

(vi)  Its performance of this Agreement will not violate or breach any applicable law, regulation, contract or other requirement.



(B)     *Client.* The Client also represents at the date this Agreement is entered into and any custodial service is used or provided that:

(i)     It has authority to deposit the Securities received in the Custody Account and the Cash in the Cash Account and there is no claim or encumbrance that adversely affects any delivery of Securities or payment of Cash made in accordance with this Agreement;

(ii)    Where it acts as an agent on behalf of any of its own customers, whether or not expressly identified to the Custodian from time to time, any such customers shall not be customers or indirect customers of the Custodian; and

(iii)   It has not relied on any oral or written representation made by the Custodian or any person on its behalf.

## 10.    SCOPE OF RESPONSIBILITY

(A)     *Standard of Care.* The Custodian shall exercise the due care of a professional custodian for hire.

(B)     *Limitations on Losses.* The Custodian will not be responsible for any loss or damage suffered by the Client unless the loss or damage results from the Custodian's negligence, wilful misconduct or fraud or the negligence, wilful misconduct or fraud of its nominees or any branch or subsidiary; in the event of such negligence or wilful misconduct the liability of the Custodian in connection with the loss or damage will not exceed (i) the lesser of replacement of any Securities or the market value of the Securities to which such loss or damage relates at the time the Client reasonably should have been aware of such negligence or wilful misconduct and (ii) replacement of Cash, plus (iii) compensatory interest up to that time at the rate applicable to the base currency of the Cash Account. Under no circumstances will the Custodian be liable to the Client for consequential loss or damage, even if advised of the possibility of such loss or damage.

(C)     *Limitations on the Custodian's Responsibility.*

(i)     *General.* The Custodian is responsible for the performance of only those duties as are expressly set forth herein, including the performance of any Instruction given in accordance with this Agreement. The Custodian shall have no implied duties or obligations.

(ii)    *Sole Obligations of the Custodian.* The Client understands and agrees that (i) the obligations and duties of the Custodian will be performed only by the Custodian and are not obligations or duties of any other member of the Citigroup Organisation (including any branch or office of the Custodian) and (ii) the rights of the Client with respect to the Custodian extend only to such Custodian and, except as provided by law, do not extend to any other member of the Citigroup Organisation.

(iii)   *No Liability for Third Parties.* Except as provided in Section 8 hereof, the Custodian is not responsible for the acts, omissions, defaults or insolvency of any third party including, but not limited to, any broker, counterparty or issuer of Securities.

(iv)    *Performance Subject to Laws.* The Client understands and agrees that the Custodian's performance of this Agreement is subject to the relevant local laws, regulations, decrees, orders and government acts, and the rules, operating procedures and practices of any relevant stock exchange, Clearance System or market where or through which Instructions are to be carried out and to which the Custodian is subject and as exist in the country in which any Securities or Cash are held.

(v)     *Prevention of Performance.* The Custodian will not be responsible for any failure to perform any of its obligations (nor will it be responsible for any unavailability of funds credited to the Cash Account) if such performance is prevented, hindered or delayed by a Force Majeure Event, in such case its obligations will be suspended for so long as the Force Majeure Event continues. "Force Majeure Event" means any event due to any cause beyond the reasonable control of the Custodian, such as restrictions on convertibility or transferability, requisitions, involuntary transfers, unavailability of communications system, sabotage, fire, flood, explosion, acts of God, civil commotion, strikes or industrial action of any kind, riots, insurrection, war or acts of government.

(vi)    **Client's Reporting Obligations.** The Client shall be solely responsible for all filings, tax returns and reports on any transactions in respect of Securities or Cash or relating to Securities or Cash as may be required by any relevant authority, whether governmental or otherwise.

(vii)   **Validity of Securities.** The Custodian shall exercise reasonable care in receiving Securities but does not warrant or guarantee the form, authenticity, value or validity of any Security received by the Custodian. If the Custodian becomes aware of any defect in title or forgery of any Security, the Custodian shall promptly notify the Client.

(viii)  **Capacity of Custodian.** The Custodian is not acting under this Agreement as an investment manager, nor as an investment, legal or tax adviser to the Client, and the Custodian's duty is solely to act as a Custodian in accordance with the terms of this Agreement.

(ix)    **Forwarded Information.** The Custodian is not responsible for the form, accuracy or content of any notice, circular, report, announcement or other material provided under Section 6(B)(iv) of this Agreement not prepared by the Custodian including the accuracy or completeness of any translation provided by the Custodian in regard to such forwarded communication.

## 11.    SUBROGATION

To the extent permissible by law or regulation and upon the Client's request, the Client shall be subrogated to the rights of the Custodian with respect to any claim for any loss, damage or claim suffered by the Client, in each case to the extent that the Custodian fails to pursue any such claim or the Client is not made whole in respect of such loss, damage or claim. Notwithstanding any other provision hereof, in no event is the Custodian obliged to bring suit in its own name or to allow suit to be brought in its name.

## 12.    INDEMNITY

(A)    **Indemnity to the Custodian.** The Client agrees to indemnify the Custodian and to defend and hold the Custodian harmless from all losses, costs, damages and expenses (including reasonable legal fees) and liabilities for any claims, demands or actions (each referred to as a "Loss"), incurred by the Custodian in connection with this Agreement, except any Loss resulting from the Custodian's negligence, wilful misconduct or fraud. Under no circumstances will the Client be liable to the Custodian for consequential loss or damage, even if advised of the possibility of such loss or damage.

(B)    **Client's Direct Liability.** The disclosure by the Client to the Custodian that the Client has entered into this Agreement as the agent or representative of another person shall not relieve the Client of any of its obligations under this Agreement.

## 13.    LIEN AND SET OFF

(A)    **Lien.** In addition to any other remedies available to the Custodian under applicable law, the Custodian shall have, and the Client hereby grants, a continuing general lien on all Securities until the satisfaction of liabilities arising under this Agreement of the Client to the Custodian in respect to any fees and expenses or credit exposures incurred in the performance of services under this Agreement.

(B)    **Set Off.** To the extent permitted by applicable law and in addition to any other remedies available to the Custodian under applicable law, the Custodian may, without prior notice to the Client, set off any payment obligation owed to it by the Client in connection with all liabilities arising under this Agreement against any payment obligation owed by it to the Client under this Agreement regardless of the place of payment or currency of either obligation (and for such purpose may make any currency conversion necessary).

## 14.    FEES AND EXPENSES

The Client agrees to pay all fees, charges and obligations incurred from time to time for any services pursuant to this Agreement as determined in accordance with the terms of the Fee Schedule, which may be changed from time to time by the Custodian upon prior written notice to the Client, together with any other amounts payable to the Custodian under this Agreement. The Custodian may debit the Cash Account to pay any such fees, charges and obligations.

## 15.    CITIGROUP ORGANISATION INVOLVEMENT

The Client agrees and understands that any member of the Citigroup Organisation can engage as principal or otherwise in any transaction effected by the Client or by any person for its account and benefit, or by or on behalf of any counterparty or issuer. When instructed to effect any transactions (particularly foreign exchange transactions), the Custodian is entitled to effect any transaction by or with itself or any member of the Citigroup Organisation and to pay or keep any fee, commissions or compensation as specified in the Client's Instruction or, if no specification is provided, any charges, fees, commissions or similar payments generally in effect from time to time with regard to such or similar transactions.

## 16.    RECORDS AND ACCESS

(A)    *Examination of Statements.*  The Client shall examine each statement sent by the Custodian and notify the Custodian in writing within sixty (60) days of the date of such statement of any discrepancy between Instructions given by the Client and the position shown on the statement and of any other errors known to the Client. Absent such notification, the Custodian's liability for any loss or damage in regard to such discrepancy or errors shall not accrue beyond such sixty (60) days.

(B)    *Access to Records.*  The Custodian shall allow the Client and its independent public accountants, agents or regulators reasonable access to the records of the Custodian relating to Securities or Cash as is required by the Client in connection with an examination of the books and records pertaining to the affairs of the Client and will seek to obtain such access from each subcustodian and Clearance System.

## 17.    INFORMATION

The Custodian will treat information related to the Client as confidential but, unless prohibited by law, the Client authorises the transfer or disclosure of any information relating to the Client to and between the branches, subsidiaries, representative offices, affiliates and agents of the Custodian and third parties selected by any of them, wherever situated, for confidential use in connection with the provision of services to the Client (including for data processing, statistical and risk analysis purposes), and further acknowledges that any such branch, subsidiary, representative office, affiliate, agent or third party may transfer or disclose any such information as required by any law, court, regulator or legal process.

The Client will treat the terms of this Agreement, including any Fee Schedule, as confidential.

## 18.    ADVERTISING

Neither the Client nor the Custodian shall display the name, trade mark or service mark of the other without the prior written approval of the other, nor will the Client display that of Citigroup, Inc. or any subsidiary of Citigroup, Inc. without prior written approval from Citigroup, Inc. or the subsidiary concerned. The Client shall not advertise or promote any service provided by the Custodian without the Custodian's prior written consent.

## 19.    TERMINATION

(A)    *Date of Termination.*  Any party may terminate this Agreement in whole or as between itself and the other parties hereto by giving not less than sixty (60) days' prior written notice to such other parties.

(B)     **Effect on Property.** The Custodian shall deliver the Securities and Cash as instructed by the Client. If by the termination date the Client has not given instructions to deliver any Securities or Cash, the Custodian will continue to safekeep such Securities and/or Cash until the Client provides instructions to effect a free delivery of such. However, the Custodian will provide no other services as regard to any such Securities except to collect and hold any cash distributions. Notwithstanding termination of this Agreement or any Instruction, the Custodian may retain sufficient Securities or Cash to close out or complete any transaction that the Custodian will be required to settle on the Client's behalf.

(C)     **Surviving Terms.** The rights and obligations contained in Sections 7, 10, 12, 13, 17, 18 and 20 of this Agreement shall survive the termination of this Agreement.

## 20.     GOVERNING LAW AND JURISDICTION

(A)     **Governing Law.** This Agreement shall be governed by and construed in accordance with the internal laws (and not the laws of conflicts) of the country in which the Custodian is located and performs its obligations hereunder.

(B)     **Jurisdiction.** The courts of the country in which the Custodian is located and performs its obligations hereunder (including any appropriate sub-jurisdiction) shall have non-exclusive jurisdiction to hear any disputes arising out of or in connection with this Agreement, and the parties irrevocably submit to the jurisdiction of such courts.

(C)     **Venue.** Each party hereto waives any objection it may have at any time, to the laying of venue of any actions or proceedings brought in any court specified in Section 20(B) hereof, waives any claim that such actions or proceedings have been brought in an inconvenient forum and further waives the right to object that such court does not have jurisdiction over such party.

(D)     **Sovereign Immunity.** The Client and the Custodian each irrevocably waives, with respect to itself and its revenues and assets, all immunity on the grounds of sovereignty or similar grounds in respect of its obligations under this Agreement.

## 21.     MISCELLANEOUS

(A)     **Entire Agreement.** This Agreement consists exclusively of this document together with the schedules. The Custodian may notify the Client of terms which are applicable to the provision of services in the location of a particular office and such terms shall be contained in a schedule and shall supplement this Agreement in relation to that office. In case of inconsistency with the rest of this Agreement, such terms shall prevail in relation to that office.

(B)     **Amendments.** Except as specified in this Agreement, all amendments or changes to this Agreement shall be authorized by (a) the Client by written consent, and (b) the Custodian by written consent signed by an authorized officer of the Custodian. Provided, however: (i) **Appendix "A"** listing the Funds for which the Custodian serves as custodian may be amended from time to time to add one or delete one or more Funds (but not all the funds), by execution and delivery to the Custodian by the Client of an amended **Appendix "A"**, and the execution of such amended Appendix by the Custodian, in which case such amendment shall take effect immediately upon execution by the Custodian; unless otherwise agreed by the Custodian and the Client in writing.

(C)     **Severability.** If any provision of this Agreement is or becomes illegal, invalid or unenforceable under any applicable law, the remaining provisions shall remain in full force and effect (as shall that provision under any other law).

(D)     **Waiver of Rights.** No failure or delay of the Client or the Custodian in exercising any right or remedy under this Agreement shall constitute a waiver of that right. Any waiver of any right will be limited to the specific instance. The exclusion or omission of any provision or term from this Agreement shall not be deemed to be a waiver of any right or remedy the Client or the Custodian may have under applicable law.



(E) **Recordings.** The Client and the Custodian consent to telephonic or electronic recordings for security and quality of service purposes and agree that either may produce telephonic or electronic recordings or computer records as evidence in any proceedings brought in connection with this Agreement.

(F) **Further Information.** The Client agrees to execute further documents and provide materials and information as may be reasonably requested by the Custodian to enable it to perform its duties and obligations under this Agreement.

(G) **Assignment.** No party may assign or transfer any of its rights or obligations under this Agreement without the other's prior written consent, which consent will not be unreasonably withheld or delayed; provided that the Custodian may make such assignment or transfer to a branch, subsidiary or affiliate if it does not materially affect the provision of services to the Client.

(H) **Headings.** Titles to Sections of this Agreement are included for convenience of reference only and shall be disregarded in construing the language contained in this Agreement.

(I) **Counterparts.** This Agreement may be executed in several counterparts, each of which shall be an original, but all of which together shall constitute one and the same agreement.

(J) **Limitation of Liability.** The Custodian hereby expressly agrees that the obligations pursuant to this Agreement of a particular Fund of the Client with respect to that Fund shall be limited solely to the assets of that Fund, and the Custodian shall not seek satisfaction of any such obligation from any other Fund, the shareholders of any Fund, the Trustees, officers, employees or agents of the Client, or any of them.

*IN WITNESS WHEREOF,* the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorised.

CITIBANK, N.A.

By: _____

Name: _____
STEVEN P. WAGER
VICE PRESIDENT
CITI TRANSACTION SERVICES
388 GREENWICH STREET
NEW YORK, NY 10013
212-816-6529

Title: _____

THE ADVISORS' INNER CIRCLE
FUND II

By: _____

Name: DIANNE DESCOTEAUX

Title: VP & SECRETARY

By: _____

Name: _____

Title: _____

## APPENDIX A

To the Amended and Restated Global Custodial Services Agreement dated as of ___July 1st___, 2013. This **Appendix "A"** listing the Funds for which the Custodian serves as custodian may be amended from time to time to add one or delete one or more Funds (but not all the funds), by execution and delivery to the Custodian by the Client of an amended **Appendix "A"**, and the execution of such amended Appendix by the Custodian, in which case such amendment shall take effect immediately upon execution by the Custodian; **Appendix "A"**, unless otherwise agreed by the Custodian and the Client in writing.

WESTFIELD CAPITAL LARGE CAP GROWTH FUND

WESTFIELD CAPITAL DIVIDEND GROWTH FUND

CITIBANK, N.A.

By: _____

Name: _____
STEVEN P. WAGER
VICE PRESIDENT
CITI TRANSACTION SERVICES
388 GREENWICH STREET
NEW YORK, NY 10013
212-816-6529

Title: _____

THE ADVISORS' INNER CIRCLE
FUND II

By: _____

Name: DIANNE DESCOTEAU

Title: VP & SECRETARY

By: _____

Name: _____

Title: _____

# EXHIBIT B

## ASSIGNMENT OF CLAIMS

This **ASSIGNMENT OF CLAIMS** ("**Assignment**") is effective as of May 27, 2014 (the "**Effective Date**") by and between **KOPERNIK GLOBAL ALL-CAP FUND**, a series of The Advisors' Inner Circle Fund II Trust ("**Assignor**"), and **SEI INVESTMENTS GLOBAL FUNDS SERVICES**, a Delaware statutory trust ("**Assignee**") (Assignor and Assignee are each made and referred to as a "**Party**" to this Agreement and together referred to as the "**Parties**").

## RECITALS

**WHEREAS**, as summarized in a "Description of Events" prepared by the Assignee [and attached hereto as Exhibit A - during the period beginning on or about November 5, 2013 through on or about November 11, 2013, the Assignor suffered injury as a result of the handling of certain transactions on behalf of the Assignor ("**Trade Errors**") among the Assignee, Kopernik Global Investors, LLC (the "**Adviser**") and Citibank, N.A. (the "**Custodian**") that resulted in a loss to the Assignor of approximately $630,489.13;

**WHEREAS**, despite disagreements among Assignee, the Adviser and the Custodian regarding their respective responsibility, if any, for the Trade Errors, on February 12, 2014 the Assignee reimbursed the Assignor in respect of losses in connection with the Trade Errors in the amount of $100,038.67 and on March 11, 2014 the Adviser reimbursed the Assignor in respect of losses in connection with the Trade Errors in the amount of $100,000;

**WHEREAS**, on or about April 30, 2014, despite disagreements among Assignee, the Adviser and the Custodian regarding their respective responsibility, if any, for the Trade Errors, the Assignee reimbursed the Assignor in respect of the remaining losses in connection with the Trade Errors in the amount of $430,450.46;

**WHEREAS**, Assignee and Adviser made such payments without any admission of liability or responsibility for the Trade Errors;

**WHEREAS**, Assignee believes that the Custodian is responsible for some or all of such Trade Errors and Assignee wishes to pursue the Custodian for a recovery;

**WHEREAS**, having Assignee as the sole assignee of the Assignor's claims with respect to the Trade Errors will simplify and reduce potential litigation costs should the Assignee be forced to file suit to collect on the claim against the Custodian;

**WHEREAS**, the Assignor's board of trustees, at a meeting held on May 13, 2014, assigned its full claim with respect to the Trade Errors against the Custodian to the Assignee in light of Assignee's previous payments to the Assignor;

**WHEREAS**, Assignor desires to assign, and Assignee desires to take assignment of, all of Assignor's rights, titles, interests, claims and demands in and to certain causes of action, whether or not asserted; and any and all other rights, title, interest, claims, and demands that Assignor may possess, have, or assert against any and all persons, corporations, partnerships, or sole proprietorships, their heirs, executors, successors, and assigns arising out of the facts in

connection with the Trade Errors;

**NOW THEREFORE**, expressly incorporating the foregoing Recitals, and in consideration of the premises and the mutual covenants contained herein and such other valuable consideration, the sufficiency and receipt of which is hereby acknowledged, the Parties agree as follows:

## Article I.    ASSIGNMENT BY ASSIGNOR

**Section 1.01   Assignment.** For value received, Assignor assigns and transfers to Assignee and to Assignee's legal representatives and assigns, for their use and benefit, any and all sums of money now due or owing to Assignor, and all claims, demands, and cause or causes of action of whatever kind and nature that Assignor now has, or may have, against the Custodian or the Adviser or against any other person or persons, jointly or severally, arising out of, or for, any loss, injury, or damage sustained by Assignor in connection with the facts underlying the Trade Errors.

**Section 1.02   No Recourse.** This Assignment is without recourse or warranty of any kind whatsoever, except as expressly provided in this Assignment. Assignor does not guarantee the recoverability or payment of the assigned claim(s). However, Assignor agrees that in the event any payment under the claim is made to Assignor, Assignor will promptly transmit payment to Assignee.

**Section 1.03   Power of Attorney.** Assignor appoints Assignee and Assignee's legal representatives and assigns as the attorney of Assignor with irrevocable and full power of substitution and revocation, and in the name of Assignor or otherwise but for Assignee's sole use and benefit, to ask, demand, sue for, collect, receive, compound, and give acquittances for Assignor's claim or claims, in whole or part.

**Section 1.04   Substitution.** At Assignee's election, Assignee and/or Assignee's legal representatives or assigns may be substituted in place and stead of Assignor.

## Article II.    ACCEPTANCE BY ASSIGNEE

Assignee accepts the above Assignment and agrees to take whatever steps are necessary in order to implement the Assignment.

## Article III.    MISCELLANEOUS

**Section 3.01   Payment of Attorneys' Fees.** The Parties will each be responsible for payment of their own attorneys' fees and all other expenses in connection with the matters referred to in this Assignment.

**Section 3.02   Entire Agreement.** This Assignment embodies the entire agreement and understanding of the Parties hereto in respect of the subject matter contained herein and therein as related to the Trade Errors. There are no restrictions, promises, representations, warranties, covenants, or undertakings other than those expressly set forth or referred to herein. This

Assignment supersedes any and all prior agreements and understandings between the parties with respect to such subject matter, including, without limitation, anything contained in any preliminary proposals, offers, or other communications.

**Section 3.03    Effect of Assignment**. This Assignment will be binding upon and inure to the benefit of the Parties, their respective heirs, predecessors, parents, successors, assigns, affiliates, employees, agents and any corporation or entity to which or with which any party to this Assignment may merge or consolidate. Assignor represents and warrants that it has not previously assigned, settled, nonsuited, or otherwise disposed of any claims, demands, and cause or causes of action that are the subject of this Assignment, although Assignor acknowledges receipt of payment from Adviser in connection with and as compensation for the Trade Errors as described above.

**Section 3.04    Opportunity to Review and Confer with Counsel**.    Each Party hereto confirms that before executing this instrument he or she as its authorized representative has thoroughly reviewed the terms of this Assignment, that its contents have been fully explained, that he or she as its authorized representative understands what this Assignment says, that he or she as its authorized representative has had a full and fair opportunity to confer in private with an attorney of his or her choice concerning the terms, conditions, and obligations of this Assignment, that no promises or representations of any kind have been made other than those expressly contained herein, that he or she as its authorized representative has relied solely and completely on his or her own judgment and on that of other professionals, if desired, in making this Assignment, and that he or she as its authorized representative willingly enters into this Assignment. The Parties each hereby disclaim reliance upon any representation or warranty made prior to the execution of this Assignment other than those representations or warranties expressly set forth or referred to herein.

**Section 3.05    Execution Authorized**. Each of the undersigned severally represents that he or she has been duly authorized to enter into this Assignment by his or her respective party.

**Section 3.06    Amendment**. This Assignment may be amended only in a writing signed by each of the Parties.

**Section 3.07    Law**. The interpretation of this Assignment and the rights and obligations of the Parties shall be governed by the laws of the [State of New York]. The Parties hereby expressly consent to the exclusive jurisdiction and venue of the state and federal courts located in [New York, New York] with respect to any claims arising from or related to this Assignment.

**Section 3.08    Counterparts**. This Assignment may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

[THE REST OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Parties have caused this Assignment to be executed by their duly authorized representatives as of the Effective Date.

THE ADVISORS' INNER CIRCLE FUND II TRUST, ON BEHALF OF ITS SERIES KOPERNIK GLOBAL ALL-CAP FUND

By: _____

Name: _Michael Beattie_____

Title: _President_____

Date: _5-30-2014_____

SEI INVESTMENTS GLOBAL FUNDS SERVICES

By: _____

Name: _____

Title: _____

Date: _____

DB1/ 79015780.3

4

IN WITNESS WHEREOF, the Parties have caused this Assignment to be executed by their duly authorized representatives as of the Effective Date.

THE ADVISORS' INNER CIRCLE FUND II TRUST, ON BEHALF OF ITS SERIESKOPERNIK GLOBAL ALL-CAP FUND

SEI INVESTMENTS GLOBAL FUNDS SERVICES

By: _____

By: _____

Name: _____

Name: _James F. Yolk_

Title: _____

Title: _Vice President_

Date: _____

Date: _5/27/14_